**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
PEACHES AND CREAM LLC,

        Plaintiff,

        v.

ROBERT W. BAIRD & CO. INCORPORATED
d/b/a "BAIRD CAPITAL, "BAIRD CAPITAL
PARTNERS," AND BAIRD PRIVATE EQUITY"
and NAC MARKETING COMPANY, INC.,
and NAC MARKETING COMPANY, LLC,
and Jonathan Flicker, individually and as officer/director,
all defendants, individually and collectively, as a common
enterprise under the fictitious name "NEW VITALITY,"

        Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Case No.

**COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff, Peaches and Cream LLC ("PC"), by and through its undersigned attorneys, as and for its complaint against defendants, Robert W. Baird & Co. Incorporated d/b/a "Baird Capital," "Baird Capital Partners" and Baird Private Equity (collectively, "Baird"), NAC Marketing Company, Inc. and NAC Marketing Company, LLC (collectively "NAC"), and Jonathan Flicker ("JF"), individually and collectively d/b/a New Vitality ("New Vitality"), alleges as follows:

**SUMMARY**

1.      Small businesses are the backbone of the U.S. economy, comprising 99.7% of all U.S. employer firms; 73.2% of which are sole proprietorships.[1] This action seeks to preserve and protect the very life blood of PC, one such small business, by compelling the specific performance by the Goliath defendants under their common enterprise "New Vitality" (Ex. B) of their contractual duties

---

[1] Source: U.S. Census Bureau, SUSB, CPS; International Trade Administration; Bureau of Labor Statistics, BED; Advocacy-funded research, Small Business GDP: Update 2002-2010, www.sba.gov/advocacy/7540/42371.

(Agreements, Ex. A-1,2,3[2]) to exclusively "make, manufacture, market, advertise, sell and/or distribute [PC's] Products" (A-2, ¶1.1) under U.S. Patent No. 7,211,279 (Ex. A-4).

2. Defendants failed and refused to perform under the Agreements, making, manufacturing, advertising, selling and/or distributing <u>nothing</u> and instead eventually presenting inconsistent and antithetical reasons, including even a proposed reformulation to "cure" an alleged default in PC's formulations, which, if followed, would have proven to violate the eventual position defendants asserted - - that no Products whatsoever could ever be sold. All of defendants' positions lack merit and are proven untruthful except to demonstrate defendants' clear intention to forego contractual performance entirely. (Ex. C.) Indeed, despite defendants' insistence to the contrary (Ex. C-2-o), the Federal Trade Commission ("FTC") confirmed that PC's products may be labeled, advertised and sold as an "energy shot" without any further evidence or impediment. (Ex. F.)

3. Upon information and belief, defendants' excuses in lieu of performance were the result of and intended to conceal defendants' serious exposure in a number of class action suits concerning the advertising and sale of products wholly unrelated to PC and its business. (Ex. D.)

4. Yet, in entering the exclusive Marketing and Distribution Agreement ("MDA") with defendants (Ex. A-2), PC became completely and wholly reliant and dependent upon defendants' performance for its very existence and survival. Such performance remains essential to the life of PC. In the absence of specific performance, PC will continue to suffer irreparable harm. Indeed, it would appear that defendants would have it no other way, by, in sum and substance, commanding

---

[2]"Ex. Letter-Number" refers to exhibits to this complaint, arranged in logical groups: A: Agreements; B: Common Enterprise; C: New Vitality's Breaches; D: New Vitality's Fraudulent Concealment and Inducement; E: PC's Exhaustion of Administrative Remedies; F: FTC Clearance; with numerical references to specific exhibits thereunder. Thus, <u>e.g.</u>, "Ex. A-2" refers to the Marketing and Distribution Agreement, effective February 28, 2013 ("MDA").

specific performance as if it were the sole form of relief available to PC. (Ex. A-2, ¶11.1.[3]) As such, that is precisely the relief sought herein.

**PARTIES, JURISDICTION AND VENUE**

5. Plaintiff, Peaches and Cream LLC ("PC"), is a limited liability company, organized and existing under the laws of the State of New York, with its offices in Suffolk County, New York, and is owned and run by Jason Gianelli ("Gianelli"), as PC's President, sole owner and member.

6. Upon information and belief, defendant, Robert W. Baird & Co. Incorporated, is a foreign corporation incorporated under the laws of the State of Wisconsin, licensed to do business in the State of New York and County of New York since April 29, 1971 (Ex. B-6), with a principal place of business at 610 Fifth Avenue, #308, New York, New York 10022 (Ex. B-7), which formed the common enterprise New Vitality through its buyout funds and units Baird Capital, Baird Capital Partners, and Baird Private Equity (Ex. B-3,4) ("Baird").

7. Upon information and belief, NAC Marketing Company Inc. ("NAC Inc.") is a corporation organized and existing under the laws of the State of New York, with offices at 260 Smith Street, Farmingdale, New York 11735.

8. Upon information and belief, NAC Marketing Company LLC ("NAC LLC") is a limited liability company organized and existing under the laws of Delaware, with offices at 260 Smith Street, Farmingdale, New York 11735.

---

[3]Limitation of liability, as set forth in the MDA, states as follows:

> 11.1. Limitation of Liability. To the maximum extent permitted by law, no party hereunder shall be liable to the other for any punitive damages, loss of profits, consequential damages, indirect damages or any special damages in connection with a breach of this Agreement.

9. NAC Inc. and NAC LLC are indistinguishably used by defendants as "NAC Marketing Company" ("NAC") and thus, upon information and belief, have no individual, cognizable identity or separate distinction or identity. (See, e.g., B-2, 4, 10, 12.)

10. Jonathan Flicker ("JF") is an individual, domiciled, upon information and belief, in the County of Nassau, and is the "Chief Executive Officer" of NAC and the common enterprise "New Vitality" with offices at 260 Smith Street, Farmingdale, New York 11735. (Ex. B-13.)

11. Upon information and belief, each of Baird, NAC Inc., NAC LLC and JF are operating as a common enterprise under the fictitious name "New Vitality," including common control, sharing of office space and officers and directors, transaction of business through a maze of interrelated companies, with commingling of corporate funds and failure to maintain separation of companies, unified advertising, and evidence that reveals that no distinction exists between them,[4] and thus jointly and severally liable for the activity of each of them in connection with New Vitality and defendants herein.

12. The Court has jurisdiction of this case under 28 U.S.C. §1338, as plaintiff's right to relief necessarily depends on resolution of a substantial question of federal patent law. Venue is proper upon the residences of the defendants, the operation of the common enterprise, and designation by contract. (Ex. A-2, MDA, ¶13.8.)

## FACTS

### Underlying Technology and Patent

13. On December 8, 2005, Gianelli, through counsel, lodged an application for U.S. patent with the United States Patent and Trademark Office for "Nutraceutical Method and Additive

---

[4] See, e.g., FTC v. Wolf, 94-8119-CIV Ferguson, 1996 U.S. Dist. LEXIS 1760 at *22-23 (S.D. Fla. Jan 30, 1996)(citations omitted), as cited in FTC v. National Urological Group, Inc., 645 F. Supp. 2d 1167, 1182 (N.D. Ga. 2008).

for Improving Human Physiology," receiving U.S. Serial No. 11/297,048, and which issued as U.S. Patent No. 7,211,279 on May 1, 2007. ("Patent," Ex. A-4.)

14. The Patent covers a method and composition for creating a "nutraceutical-enriched coffee drink" comprising the addition of three components: milk thistle, chromium picolinate and carnitine to a coffee drink preparation. (<u>See</u>, <u>e.g.</u>, Ex. A-4, Claim 1.)

15. Claim 1 of the Patent broadly covers the three components without restriction as to quantity. In other words, a coffee product containing the three critical components: milk thistle, chromium picolinate and carnitine, falls within the scope of the patent. The dependent claims (2-4), directed to the then preferred embodiment, quantifies the three component composition to "from about 50 to 99.7 parts by weight of the total composition" of milk thistle, "about 0.01 to 0.23 parts by weight of the total composition" of chromium picolinate, and "about 40 to 50 parts by weight of the total composition" of carnitine.

16. After years of developing and testing, Mr. Gianelli finally was able to formulate an energy shot product under the patent with a superior taste, unique in the marketplace. With the final product in hand, he next sought the perfect partner to commercialize and build the market with him for PC's "Triple Threat Energy Shot."

<u>Formation of Defendants' Common Enterprise "New Vitality"</u>

17. On or about April 6, 2010, Baird bought a majority and controlling ownership interest in NAC and immediately took control of New Vitality. Baird placed Gordon Pan, Baird Capital's managing partner, and Harry D. Schulman, Baird Capital's operating partner, on the NAC Board of Directors. It brought in Jonathan Flicker to be New Vitality's new President and CEO and a third member of the NAC Board. (Ex. B). Upon information and belief, Baird required periodic

reporting from NAC and directed and had ultimate decision making authority over New Vitality's products and contracts.

18. New Vitality has touted itself as a leading direct marketer of premium nutritional supplements and personal care products. (B-4, 14). A company with over 100 employees, New Vitality's mission was to "create the best, most well-researched products based on professional recommendations of expert nutritional teams" which confirmed that "every product is carefully formulated under the guidance of an elite panel of renowned doctors, nutritionists, chemists and researchers, then tested and re-tested." (B-14 p. 4-5). Indeed, according to New Vitality, it looked at 1000 products per year and invested in only 1 out of every 30. "Triple Threat Energy Shot" was one of those superior products and New Vitality appeared to be the perfect partner for PC - - at least based on its representations and warranties.

Agreements and PC's Dependency for Its Very Survival

19. On or about February 5, 2013, after an impromptu meeting between defendant Flicker and Gianelli, the parties executed a Mutual Confidentiality and Non Disclosure Agreement (Ex. A-1). Under this Agreement, defendants agreed that "New Vitality will not compete in the 'energy shot' market as long as it is working with Peaches and Cream" and for an additional "one year following" termination. (Ex. A-1, ¶ 12.)

20. Thereafter, on March 21, 2013, PC and defendants entered into the MDA, effective as of February 28, 2013 (the so-called "Effective Date"), under which defendants (defined as "NAC" and its "affiliates" and "related parties" (Ex. A-2, ¶13.12)), received, inter alia, the exclusive right and duty to manufacture, market and sell the Product(s), including all of PC's "Existing Products," "other mutually agreed upon products and any line extensions to those products" which included

PC's principal product "Triple Threat Energy Shot" and PC's other ready-to-market product under the patent, called "Fire and Ice." (Ex. A-2, p. 1.)

21. Under the MDA, defendants were obligated "[a]s of the Effective Date" (February 28, 2013) to "develop and implement, at [their] own cost and expense, a test marketing campaign, including but not limited to, United States local and national radio, television and internet to initiate the sale of Product through both direct response as well as retail sales support at retailers that have sixteen (16) or more locations." (Ex. A-2, ¶ 2.) In other words, defendants exclusively controlled all aspects of PC's Product(s) in all national and major retail chains and on-line.

22. Under the MDA, defendants were to "market Product to its current customer base via phone, internet and mailings as cross sell and up-sell opportunities to existing product lines." Id.

23. Under the MDA, defendants were also obliged to "promote and sell" the Products "internationally via any method and mechanism deemed suitable by Licensee, including Licensee's distributor network or direct response or retail efforts." Id.

24. Under the MDA, defendants were also obliged to provide "all operational services, from making the Product to marketing, financial, reporting, distribution, and other support functions as Licensee deems to be required in order to fully bring the Product to market in conformity with the scope of the license granted..." (Emphasis supplied, Id.)

25. Under the MDA, defendants also agreed to the payment to PC of "Guaranteed Compensation" of a minimum annual ten (10%) percent royalty on gross sales, guaranteeing, at minimum, $300,000 during the Initial Term, and, $400,000 for each year of the subsequent renewal period. (Ex. A-2, ¶ 3.4.) Payments of Guaranteed Compensation were to be made by defendants to PC at a rate of 1/12 per month ($25,000 per month for the first year) and "regardless of the extent of sales by Licensee or success of the test marketing campaign." (Ex. A-2, ¶3.5.)

26. Accordingly, per the MDA, the parties, through New Vitality's experience and expertise, anticipated gross sales of the Products to be, at minimum, $3,000,000 in the Initial Term and, upon renewal, $4,000,000 in Years 2 and 3, or $11,000,000 in minimum sales built and supported by defendants' marketing and distribution network, its radio and television advertising and directly marketed customer base.

27. Accordingly, the MDA rendered PC completely dependent upon defendants' performance for its very survival. PC was only permitted to sell Products to "retail stores which have fifteen (15) or less locations" and was dependent upon defendants' performance of "Product Marketing" to the larger stores, defendants' provision of "all operational services," and defendants' payments to PC of "Guaranteed Compensation," all essential for PC's very existence and survival. (Ex. A-2, ¶¶2, 3.4.)

<u>Labeling, Advertising and the May 29, 2013 "Term Sheet"</u>

28. Under the MDA, defendants warranted and represented that, <u>inter</u> <u>alia</u>:

> 10.2.4. all activities relating to the <u>advertising, marketing, labeling, promotion, sales and distribution of the Product</u> shall comply with any and all federal, state, county, municipal and state statutes, laws, orders and regulations of any governmental or quasi-governmental entities applicable to the Product or applicable to Licensee in connection with the performance of its obligations under this Agreement, including but not limited to any applicable regulations of the Food and Drug Administration and the Federal Trade Commission.

(Emphasis supplied, Ex. A-2, ¶10.2.4.)

29. In April 2013, a month after entering into the MDA, New Vitality for the first time advised PC that "NAC's regulatory department" had certain issues with the current label as it existed on the "Triple Threat Energy Shot" product. Defendants' proffered concern was that PC did not have in its possession documentation defendants believed they required to make some of the

statements that defendants wanted on the label.  At all times, however, under the MDA, defendants had the sole right, duty and total control over the labeling of the Product and could change the label as defendants saw fit.  (A-2 ¶¶ 1.1, 2 and 10.2.4).

30. By May 2013, all payments of "Guaranteed Compensation" had been late or delayed altogether, despite ongoing, due demand.  (Ex. C-1.)

31. On May 15, 2013, Mr. Gianelli met with Mr. Flicker in an attempt to address defendants' issues and restore contractual performance.  The meeting was held in Mr. Flicker's offices in Farmingdale, New York.  No attorneys were permitted by Mr. Flicker to be in the room.  At that meeting, the parties agreed to move forward and Mr. Gianelli was asked by Mr. Flicker to provide an additional case of the "Triple Threat Energy Shot" product and accompanying marketing literature for overnight delivery to an alleged prominent celebrity (who Mr. Flicker apparently then and there called on the telephone and who called him back) for purported marketing, sale and distribution to a major retail entity.

32. At the May 15, 2013 meeting, Mr. Flicker disclosed that New Vitality was backed by a $100 billion venture capital firm, presumably defendant Baird, and was being represented by a prominent firm, Manatt [Phelps & Phillips, LLP].

33. As a result of the meeting, on May 29, 2013, PC and NAC entered into a Term Sheet (Ex. A-3), whereby the parties, <u>inter alia</u>, reaffirmed the Guaranteed Compensation and agreed to work together to "gather substantiation and justification for the claims currently made on the label of the Products" and, if necessary, "to determine new labeling for the Products" if defendants believed it necessary.  (Ex. A-3).

34. In June 2013, though PC did not believe any changes to the current labeling on the Product(s) were necessary or warranted nor was it PC's obligation under the MDA, as a result of its

research in accordance with its performance under the Term Sheet, PC suggested defendants change the label to state "energize" which addressed any issues defendants asserted with the label. Defendants, without basis, flatly rejected it. Defendants' regulatory department advised that it would agree to claims on the label of "energize" and "supports glucose metabolism." (Ex. C-2d). Again, defendants rejected their own internal regulatory recommendation, without reason.

35. Nonetheless, in the Term Sheet, defendants provided "reasonable assurances" that they were "ready, willing and able to fully perform under the Agreement (MDA). . ." (Ex. A-3, ¶ 4.)

PC's Full Performance, Defendants' Improper Breaches, and<br>PC's Claim for Specific Performance

36. In short, under the Agreements (Ex. A), defendants, acting as a common enterprise indistinguishably holding themselves out for all business purposes under the fictitious name "New Vitality" (Ex. B[5]), with their "elite panel of renowned doctors, nutritionists, chemists and researchers" (Ex. B-14) and "partner" Baird (B-1,4), a 100 year old investment banking firm with a controlling interest (Ex. B-2,9), with its two interlocutory directors/members in control of both Baird and NAC (Ex. B-4, 10, 11), exclusively licensed the rights to "make, manufacture, market advertise, sell and/or distribute" energy beverages under U.S. Patent No. 7,211,279 for "Nutraceutical Method and Additive for Improving Human Physiology" (Ex. A-4) from PC, a closely-held LLC owned by Mr. Jason Gianelli, and promised, in return, at least eleven million dollars in sales ($11M) through its existing and sizeable marketing and advertising resources and current customer base. (Ex. A-2,3.)

37. In exchange for the exclusive patent license (Ex. A-2, MDA) and 90% of the revenue, defendants, as "New Vitality", were obliged to perform and thereby build the market for Products

---

[5]Defendant Flicker even held himself out as CEO of "New Vitality" (Ex. B-13) and "New Vitality, LLC", a purported legal entity, although no state registration for it can be found. (Ex. C-2a.)

thereunder, and provide PC with a "Guaranteed[6] Compensation" of 10%, $300,000 for the first year, and $400,000 for each of the next two years, "regardless of the extent of sales," (Ex. A-2, MDA, ¶3.4) which, based upon the 10% Royalty Rate provided (Ex. A-2, MDA, ¶3.1), constitutes $11,000,000.00 in minimum sales.[7] Such sales would have built the market, such that PC could sell to "retail stores which have fifteen (15) or less locations" the so-called "C - Stores" which are all that remained of the market to PC, after the exclusivity granted to New Vitality. (Ex. A-2, ¶1.2.1.)

38. Despite their contractual obligations in the MDA to commence upon the "Effective Date" of February 28, 2013, defendants sold absolutely nothing, advertised the Product(s) nowhere, developed no marketing plan, marketed the product to, at best, only one of their existing customers, and failed to even fully pay the first year's Guaranteed Compensation (paying only $175,000 and still owing $125,000 on that "guarantee" alone). Every payment of even the $175,000 by New Vitality to PC was late and was only received after repeated requests and nebulous excuses. (Ex. C-1.) Nothing was ever paid towards the promised advertising budget of $200,000 for every six months. (Ex. A-2, MDA, ¶6.) Nor is there any evidence that New Vitality paid anything towards any level of Product Marketing, despite the obligation to perform "a test marketing campaign," obligation to "market Product to its current customer base via phone, internet and mailings" and agreement "to promote and sell the product internationally." (Ex. A-2, MDA, ¶2.)

---

[6]"Guaranteed Compensation" was payable every month "uninterrupted for each of the subsequent . . . months, regardless of the extent of sales by Licensee." (Ex. A-2, MDA, ¶3.5.)

[7]With a "Royalty Rate" of ten percent (10%) of Gross Receipts (Ex. A-2, MDA, ¶3.1) and minimum annual royalties of $300,000 for year one, and $400,000 for each of years two and three (MDA, ¶3.4), total Royalties under the MDA would be $1,100,000, and thus representing a minimum of $11,000,000 in product sales. This builds the market, to which PC is entitled, under the Agreements.

39. The excuses concocted by defendants are not only inconsistent and antithetical, but all prove to be pretextual, hollow and untrue. To the extent any consistency can be found in these excuses in lieu of performance, they fall into two categories. <u>First</u>, defendants claim that the "current formulation of the Product is not within the scope of the Patent"[8] (Ex. C-2i, j, o). <u>Second</u>, defendants claim that there are no "double blind placebo controlled clinical studies" as they assert is required to substantiate the "detoxifies," "burns fat" and "energize" on a product label over which <u>defendants</u> have <u>exclusive</u> control under the Agreements[9]. (Ex. C-2o.) As a result, on October 30, 2013,

---

[8]Defendants' contention that the Products "do not fall within the scope of the Patent" is simply untrue, and not supported (or supportable) by anyone of ordinary skill in the art, nor any patent attorney or qualified expert. While the quantities of the three components are not immediately within the range of the embodiment <u>preferred</u> nearly a decade ago, the claims, specifically Claim 1, which <u>define</u> the "scope of the Patent" have no restrictions whatsoever on quantities. Claim 1 reads:

> 1. A method for creating a nutraceutical-enriched coffee drink comprising the addition of a flavorless nutraceutical additive composition to a coffee drink preparation, wherein the composition comprises:
>
> (a)   milk thistle;
> (b)   chromium picolinate, and
> (c)   carnitine.

(Ex. A-4.) This triggers jurisdiction under 28 U.S.C. § 1338. Clearly anyone making the Products under the Patent and wholesaling to defendants would require a license from PC under the Patent. Thus, defendants are in breach of the Agreements for advancing their position on the Patent in lieu of performance.

[9]"Licensee warrants and represents that . . . all activities relating to the advertising, marketing, labeling, promotion, sales, and distribution of the Product shall comply with any and all federal, state, county, municipal and state statutes, laws, orders and regulations of any governmental or quasi-governmental entities applicable to the Product or applicable to Licensee in connection with the performance of its obligations under this Agreement, including but not limited to any applicable regulations of the Food and Drug Administration and the Federal Trade Commission." (Ex. A-2, MDA, ¶10.2, ¶10.2.4.) This comports with the exclusive grant to defendants to "make, manufacture, market, advertise, sell and/or distribute the Products, throughout the world, through any and all distribution channels selected by Licensee . . ." (Ex. A-2, MDA, ¶1.1.1.)

defendants finally took their ultimate position asserting that PC's "Triple Threat Energy Shot" cannot be "lawfully" sold at all, in any form or fashion, and unilaterally terminated the Agreements. (Id.)

40.   PC objected at every such turn by demonstrating the erroneous nature of defendants' arguments (see, e.g., Ex. C-2m), and, each time, was met by defendants with a stepped-up offensive, initially ignoring Claim 1, and thereafter going so far as to intimidate PC and its principals with personal liability from the FTC should they choose to sell the patented, nutraceutical products without pharmaceutical-level support, under threats that the FTC would shut it down. (Ex. C-2o.)

41.   As the evidence would show, since signing the Agreements, PC has fully performed in good faith, and struggled and negotiated non-stop with defendants. Finally, left with no other recourse, on August 1, 2014, PC turned directly to the FTC, seeking guidance. (Ex. F-1.) Notwithstanding all of defendants' lawyering, however, discussion with the FTC Chief of Staff, Division of Advertising Practices, confirmed that PC's "Triple Threat Energy Shot", as formulated, could, in fact, be lawfully sold, and, indeed, as an "energy drink" and with claims that it would "energize." (Ex. F-3.)

42.   Thus, by September 20, 2014, the FTC supported the very conclusion that PC's counsel proffered on June 19, 2013 and exhaustingly pressed thereafter. (Ex. F-3, C-2f.) Since defendants were dead wrong on their Patent position and on their FTC contention, but clearly unwilling to perform under the Agreements, rather than continuing in good faith to negotiate with defendants, PC has instead sought judicial intervention. Only the Court can determine the scope of the Patent and the obligation to perform in accordance with the FTC's position on labeling, per the September 20, 2014 FTC conclusion. (Id.)

43.   Moreover, in searching for why defendants would seek to void the very deal they solicited and created under the Agreements (Ex. A), and proffer continually inconsistent and

incorrect positions in lieu of performance, through PC's own research (certainly <u>not</u> because defendants were forthcoming), PC discovered that defendants' common enterprise of "New Vitality," publicly heralded as one of the flagship entities owned and controlled by Baird (Ex. B-8), had been sued in, <u>inter alia</u>, two class action cases[10] for its fraudulent marketing and sale of their marquee "Super Beta Prostate" (Ex. D-3) and "Ageless Male" (Ex. D-1) nutraceutical products, suits brought virtually simultaneously with entering in, and surrounding the Agreements. The allegations of false advertising and mislabeling claims described therein were horrendous. The consequences included hundreds of thousands of dollars in payments and at least one injunction, that even provided the suing plaintiffs with the right to review labeling in advance of New Vitality's sales (<u>See</u>, <u>e.g.</u>, Ex. D-2).

  44. In addition, by a decision almost simultaneously emerging from the FTC,[11] combined with New Vitality's history of prior FDA/FTC violations (as exemplified by the December 31, 2012 injunction (Ex. D-2)), New Vitality was, upon information and belief, under a heightened sense of scrutiny, which barred the sale of <u>any</u> nutraceutical products that lacked in pharmaceutical (double blind, placebo controlled, human clinical study) support. Yet, no one at the common enterprise of New Vitality bothered to inform PC of any of it. Instead, defendants misrepresented and mis-warranted their full capacity to perform and claimed PC's Products could not be sold ostensibly under FTC guidelines that, as of just a few weeks ago, were flatly rejected by the FTC itself. The existence and outcome of these two class action cases certainly open the door to an explanation of

---

[10] Indeed, PC discovered up to six (6) class action cases brought against New Vitality.

[11] In <u>In the Matter of POM Wonderful, et al.</u>, Docket No. 9344 (January 10, 2013), the FTC set out grounds for a twenty (20) year injunction for so-called "repeat offenders." Clearly, <u>this</u> is Baird's concern with New Vitality. Of course, PC is not, and has never been even a "single" offender of any such FDA/FTC rules or regulations.

why there are apparently no <u>new</u> products whatsoever emanating from New Vitality for nearly two years, and defendants' fear of selling Products under the Agreements. Yet, defendants should not be permitted to exploit PC or foist upon PC and its Products under the Agreements the punishment arising from the "repeated" nature of New Vitality's actions and its perceived repeat-offender status with respect to other and different of New Vitality's products.

45. Defendants sought to hide the facts and shift the blame to PC for not having double blind placebo controlled human clinical studies (<u>see</u>, <u>e.g.</u>, Ex. C-2-o) - - the absence of which are facts never once concealed, always admitted by PC long before, during and after entry into the Agreements, and still, to this day of no real moment to PC, the FTC and the commercialization of the Products. Indeed, there is simply <u>no</u> obligation under the Agreements for PC to have had any such studies, and defendants are well aware of this fact. Actually, to the extent required at all, such studies for "Triple Threat Energy Shot," "Fire and Ice" or any other PC Products under the Agreements were the explicit obligation of New Vitality as part of its "operational services" and other obligations and representations. (Ex. A-2, ¶¶ 2, 10.2.4, 10.2.5.)

46. In truth, PC never had any duty to meet any such pharmaceutical standard in any contractual, real or equitable sense. Nor does PC even maintain the <u>right</u>, let alone any duty, to make <u>any</u> claims, or even pick the label, as that right and duty fell <u>squarely and exclusively</u> with and upon New Vitality under the Agreements (Ex. A).[12] As the evidence would show, defendants have no

---

[12] "Licensee warrants and represents that...all activities relating to the advertising, marketing, labeling, promotion, sales, and distribution of the Product shall comply with any and all federal, state, county, municipal and state statutes...including but not limited to any applicable regulations of the Food and Drug Administration and the Federal Trade Commission."(Ex. A-2, MDA, ¶10.2.4.)

good faith justification for breaching the Agreements, and PC has every right to insist on defendants' full performance.

47. The absence of even the contractually-mandated test marketing by defendants, leaves PC suffering ongoing irreparable harm that cannot be compensated for with mere money damages, alone. PC pre-purchased 100 thousand units of the product in anticipation of sales, and in recognition of the 60 day turn-around time in manufacturing batches by Natural Products Packaging, Ltd., d/b/a "Bio-Botanica," a renowned industry-leader in dietary supplement manufacturing. 25,000 units of the product are soon to expire in their twenty–four month (24) life span (January 2015), unless performance immediately occurs. In short, PC is facing imminent, immediate and irreparable harm.[13]

48. Since defendants' failure and refusal to honor its contractual commitments is ongoing, PC has no choice but to seek judicial intervention in law and in equity, compelling defendants to perform prospectively, and to pay for their delays in performance, retrospectively. Plaintiff seeks to hold defendants to their Agreements (Ex. A), and thus seek in remedy, inter alia, a preliminary and permanent injunction and judgment directing defendants' immediate and specific performance in full under their Agreements for which PC has no adequate remedy at law.

WHEREFORE, plaintiff, PC, demands relief against each of defendants, jointly and severally, compelling specific performance under the Agreements (Ex. A), including, without

---

[13] With settlement negotiations going nowhere, and prior to taking the ultimate step of judicial intervention, on July 23, 2014, PC addressed FINRA, hoping that Baird, a member of both FINRA and the New Vitality common enterprise, would respond through that administrative organization. Yet, FINRA directed PC to the courts. (Ex. E.) On August 1, 2014, PC also addressed the FTC directly, and, finally, with good results. (Ex. F.)

limitation, the immediate marketing and sale of Products at the rates set forth in the MDA, bearing at least the claim "energize" or as an "energy drink," or with any other claims defendants deem prudent and appropriate for the Product(s) under the Agreements or for which substantiation can be provided, together with the payment of ongoing Guaranteed Compensation at the rate set forth therein ($25,000 per month), for the remaining term of five (5) months ($125,000) and gross sales of PC Product(s) of at least $3,000,000, represented as the "guaranteed" minimums, and, thereupon, a good faith determination of whether to renew, all in accordance with the MDA (Ex. A-2), and for such other and further relief as is just and proper.

Respectfully submitted,

Dated: November 11, 2014
Northport, New York

Mitchell A. Stein, Esq.
Bradley R. Slenn, Esq.[14]
STEIN LAW, P.C.
Attorneys for Plaintiff
24 Woodbine Avenue, Suite 4
Northport, New York 11768
631-757-8400 (voice)
631-757-8404 (fax)
www.kingofip.com
mitch@kingofip.com
blsenn@kingofip.com

To: William L. Abrams, Esq.
Robert J. Bergson, Esq.
Abrams Garfinkel Margolis Bergson, LLP
Counsel to New Vitality (common enterprise)
1430 Broadway, 17th Floor
New York, New York 10018

---

[14] Admitted in the States of New Jersey, California, Pennsylvania and Florida. Mr. Slenn will properly seek admission, pro hac vice, in the within action.

COMPLAINT
PC V. BAIRD, ET AL.

★★★ STEIN LAW, P.C. ★★★

PAGE -17-
NOVEMBER 11, 2014